UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|                          |     |                              |
|--------------------------|-----|------------------------------|
| MATTHEW GIORGIO and      | )   |                              |
| COLIN TRAVER,            | )   |                              |
|                          | )   |                              |
| Plaintiffs,              | )   |                              |
|                          | )   |                              |
| v.                       | )   | Civil Action No. 12-11171-LTS |
|                          | )   |                              |
| STEVEN DUXBURY,          | )   |                              |
|                          | )   |                              |
| Defendant.               | )   |                              |

_____

MEMORANDUM AND ORDER ON STEVEN DUXBURY'S
MOTION FOR NEW TRIAL, REMITTITUR OR QUALIFIED IMMUNITY

March 25, 2015

SOROKIN, J.

After a three day trial, the jury determined that Steven Duxbury ("Duxbury"), a thirty-

three-year Department of Correction ("DOC") employee (now retired) who served as the

Director of Treatment for the Pondville Correctional Center ("Pondville"), violated the First

Amendment rights of Matthew Giorgio ("Giorgio") and Colin Traver ("Traver") (collectively

"Plaintiffs") during their incarceration as pre-release inmates at Pondville. Specifically,

Plaintiffs' 42 U.S.C. § 1983 claim asserted that Duxbury failed to provide them with access to

smudging—a Native American religious ceremony—during their incarceration at Pondville, and

that he threatened Plaintiffs' pre-release status if they continued to pursue smudging. The jury

awarded compensatory damages in the amount of $50,001.00 to Giorgio and $50,000.00 to

Traver. The jury also awarded them punitive damages in the amount of $500,000.00.

Subsequently, Duxbury filed an assented-to Motion to Vacate the Punitive Damages Award,

Doc. 205, which the Court ALLOWED, Doc. 209, and thus, those portions of Duxbury's

motions, Docs. 128 and 154, which address punitive damages are DENIED AS MOOT. The

Court now addresses the remaining issues presented by Duxbury's motions.

### I.   NEW TRIAL

Pursuant to Federal Rule of Civil Procedure 59, Duxbury seeks a new trial, asserting that:

(1) this Court neglected to properly investigate evidence of jury misconduct; (2) the jury's

verdict is against the weight of evidence; (3) Duxbury is qualifiedly immune from damages

under 42 U.S.C. § 1983 as a matter of law; (4) the verdict was the result of passion and

prejudice; and, (5) there existed a conflict of interest between the assigned DOC attorney and

Duxbury. For the following reasons, Duxbury's Motion for a New Trial is DENIED.

### A.   Jury Misconduct

Duxbury argues that the jury entered into premature deliberations which the Court failed

to investigate and address. On the third day of trial, before closings and deliberation, the jury

sought, in writing, answers to three questions. Doc. 121 at 16. The courtroom discussion, in

relevant part, was as follows:

> THE DEPUTY CLERK: They're all here, [referring to the jury in the jury room],
> but they've given me a list of questions.
>
> THE COURT: All right. So they have three questions. I'll read them to you. One -
> - this is unsigned.-- did it come from all the jurors?
>
> THE DEPUTY CLERK: It came from all of them. They all grouped together and
> put their questions together.
>
> THE COURT: Oh. All right. One, dates Giorgio and Traver were admitted into
> Pondville and discharged. Two, dates Traver was admitted into Norfolk and
> discharged. Three, requesting one complete copy of the religious services
> handbook. Well, those seem pretty easy. We're giving them the religious service
> handbook, right? That's Exhibit 7.
>
> MR. MCCORMICK: It's 7 and 8.

THE COURT: 8 is the excerpt, seven is – all right. Is it -- it may be that they've heard testimony about those dates. I think they have. But just to answer their questions, what are the –

MR. MCCORMICK: I believe –

THE COURT: Giorgio -- Traver came to Pondville first, right?

MR. MCCORMICK: Yes, Your Honor. And I believe that would be May 12, 2009.

THE COURT: May 12, 2009. Do you agree with that, Mr. McFarland?

MR. MCFARLAND: I agree, Your Honor.

THE COURT: All right. And then Mr. And then Mr. Traver left Norfolk in December of –

MR. MCFARLAND: December 21st, Your Honor.

THE COURT: December 21, 2009 and that's when he went to Norfolk?

MR. MCCORMICK: Yes, Your Honor.

THE COURT: And then he was discharged from Norfolk to the streets, so to speak, on what –

MR. MCCORMICK: April 27, 2010.

THE COURT: All right. And he never returned to Pondville, right?

MR. MCCORMICK: No, Your Honor.

THE COURT: And then Mr. Giorgio arrived at Pondville –

MR. MCCORMICK: On May 22nd -- May 21st of 2009.

THE COURT: And he was discharged from Pondville to the street?

MR. MCCORMICK: On March 16th, Your Honor.

THE COURT: Of 2010.

MR. MCCORMICK: Yes, Your Honor.

THE COURT: So if this is correct and you both agree, then what I would tell them is the answer to question number one, is Mr. Giorgio was admitted to Pondville on May 21, 2009, and discharged and released --discharged from Pondville and released on March 16, 2010. Mr. Traver was admitted to Pondville on May 12, 2009. He was moved or transferred from Pondville to MCI Norfolk on December 21, 2009, where he remained until he was discharged and released from Norfolk on April 27, 2010. And as to their -- that would answer questions one and two. As to question three, I have said they're receiving that. It's Exhibit 7, with excerpted eight, and they'll have all those exhibits when they deliberate. Is that agreeable to both of you.

MR. MCCORMICK: Yes, Your Honor.

MR. MCFARLAND: Yes, Your Honor.

THE COURT: All right. So I will explain the answers to those questions when they come in and then we'll have closing argument and then jury instruction and then they'll deliberate.

MR. MCCORMICK: Your Honor, I loathe to bring this up, but I question how the jurors even came up with these questions, if they're not –

THE COURT: Deliberating.

MR. MCCORMICK: Deliberating.

MS. KENNEDY: Yeah.

THE COURT: I thought about that and here's what I will do -- or here's my thought and here's what I propose doing. My thought is that I told the jurors in the preliminary instructions that they were entitled to ask questions, so they are entitled to ask questions. So in that sense, the asking questions is both permissible while they're sitting here. They can think about – nothing prohibits them from thinking about the case when they're not in the courtroom and composing a question and they understand that they're about to have closing arguments and they may have thought this is their last -- this is their chance, and they haven't had it.  It's true that the fact that it appears to be from Ms. Simeone's report, a group question, rather than an individual question, suggests in some way they did – they at least may have talked about the case. If you're both agreeable, then what I'll do is I'm going to answer the questions, tell them -- and I will tell them that they are -- one of my instructions has been and remains that they're not to discuss the case among -- with -- either with anyone else or among themselves until they commence deliberations, and they haven't yet commenced deliberations. And to the extent that this is--to the extent that they talked about—it's unclear to me whether they actually talked about the case, or whether the one person said, I'm

4

going to ask these questions, and everyone else just said, okay, and I'd like to know that, too, which doesn't really seem like a violation of the rule in a meaningful way. In any way, in any event, I'll just tell them to the extent that if they have any discussion about these events or otherwise, put that out of your mind until after closing arguments.

Is that agreeable?

MR. MCCORMICK: That's agreeable to me, Your Honor.

MR. MCFARLAND: Yes. Your Honor. That's fine.

THE COURT: All right. Why don't you go get the jury.
(The jury enters the courtroom.)

. . .

The COURT: … Ms. Simeone gave me three questions that were posed by one or more of you. The first question was  the dates Giorgio and Traver were admitted into Pondville and discharged, second, the dates Traver was admitted into Norfolk and discharged, and third, requesting one complete copy of the religious services handbook. So let me answer, I've talked to the lawyers and I have answers that they both agree with for you. With respect to Mr. Giorgio, he was admitted to Pondville on May 21, 2009 and he remained there until he was discharged and released on March 16, 2010. Mr. Traver was admitted to Pondville on May 12, 2009. He remained there until December 21, 2009, when he was transferred to MCI Norfolk, where he remained until he was discharged and released on April 27, 2010. Regard -- I think that fully answers questions one and two. With respect to question three, the answer is, you will have that. Exhibit 7 is a complete copy of the religious services handbook. It is in evidence. And Exhibit 8 is an excerpt from Exhibit 7, the excerpt concerning Native Americans. When – what's going to happen this morning in a moment is you'll hear closing arguments from the lawyers and after closing arguments, I'll give you -- read to you my instructions on the law. Then you will return to the jury room and actually not commence deliberations. You will wait, not long, probably a minute, maybe five minutes, until we deliver to you three things. A written copy of my jury instructions, a written jury verdict form, which has the specific questions for you to answer in rendering your verdict, which I will explain to you when I give you my instructions and a copy of all of the documents and photographs that were admitted into evidence. The reason why you don't have them when you literally walk out of the room is it takes us -- the lawyers use them in the course of their arguments sometimes and it takes us a minute, sometimes five minutes to collect them. Ms. Simeone will then deliver them to you in the jury room. At that point, you can commence your deliberations. Now, before that point, in that brief window of time, just as I've been telling you throughout the case, don't discuss the case among yourselves, don't discuss it with anyone else, keep an open mind.

You should do that during that brief window of time until you have it. Because until you have the instructions and the evidence, you're not ready to commence your deliberations and then you would be. Insofar as – it's unclear to me whether these three questions are a question from one of you, or a question from all of you. So insofar as a question from all of you, which then would begin to suggest that perhaps you had discussed the case -- somebody came up with the questions and then everyone else said, well, I like these questions, or there was some at least brief discussion about it, I remind you that you haven't heard the instructions on the law yet and you haven't heard the closing arguments, so you should keep an open mind. To the extent that there was any brief or minor discussion just about these questions and how to formulate them or what questions you might have had, I ask you to put that out of your mind. Any comments that any one of you might have made to any of the others, you should have an open mind now, you should keep an open mind until after you've heard the closing arguments and the instructions and then until you begin the deliberations. All right?

Counsel, are you ready to proceed?

MR. MCFARLAND: Yes, Your Honor.

Doc. 121 at 16-21.

Based on this exchange, Duxbury seeks a new trial on the grounds of jury misconduct and the Court's failure to conduct an adequate investigation, which he maintains should have included interviewing the jurors. Doc. 129 at 3-4. District courts have "significant discretion in determining the type of investigation required by a juror misconduct claim," and "the court's discretion is at its broadest when determining how to deal with an allegation of premature jury deliberations." United States v. Mikutowicz, 365 F.3d 65, 74 (1st Cir. 2004). In assessing whether a jury engaged in premature deliberations "[t]rial courts employ a multi-step framework." United States v. Diaz, 597 F.3d 56, 62 (1st Cir. 2010). "The court first must ascertain whether the allegation is colorable. If it is, the court must investigate to assess[] the magnitude and extent of any prejudice caused and, where necessary, it must consider prophylactic measures to alleviate the prejudice." Id. (internal citations and quotation marks omitted).

6

In <u>Diaz</u>, the jury gave a note to the court about ninety minutes into the trial requesting an answer to "the meaning of conspiracy and what the government has to prove beyond a reasonable doubt." <u>Id.</u> at 60. The note was signed by a single juror but was referred to as "our question." <u>Id.</u> The court informed the jurors that it would address the question during jury instructions. <u>Id.</u> at 61. The court then continued with the trial. <u>Id.</u> Counsel for the defendant did not object to how the court proceeded until the next morning when she raised the issue of premature jury deliberation, and suggested to the court it question the jury as a group without counsel present. <u>Id.</u> The district court declined to probe the jurors, but instead, reminded them about its earlier admonition against discussing the case before all the evidence was presented.  <u>Id.</u> No objection followed the court's instruction. <u>Id.</u>

On these facts, the First Circuit held:

> We cannot fault the court for that measured course of action. Just the day before the note was received, after the jurors were sworn, they had been told not to discuss the case until after they heard all of the testimony.The note barely intimated that the jurors had violated that prohibition at all, let alone engaged in inappropriate deliberation. Although the use of the pronoun "our" suggested a conversation among at least two jurors, the note requested clarification only of a legal principle and gave no indication that the jurors had discussed the merits of the case against the defendant.

<u>Id.</u> at 63.

Moreover, "[c]onversations between jurors concerning the case they are hearing do not always amount to premature deliberations." <u>Id.</u> (citing <u>United States v. Peterson</u>, 385 F.3d 127, 135 (2d Cir. 2004) ("Not every comment a juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition of deliberation.") and <u>United States v. Mikutowicz</u>, 365 F.3d 65, 75 (1st Cir. 2004) (finding no duty to investigate where juror expressed doubt about her ability to determine guilt because that conversation was "a far cry from a conversation in which the jurors discussed the merits of the

parties' positions")); see also  United States v. Jadlowe, 628 F.3d 1, 18 (1st Cir. 2010) ("Of course, not all premature jury discussion about a case will compromise a defendant's fair trial rights, particularly where the conversation does not reflect a point of view about the evidence or the outcome.").

Fairly read, the record suggests that, at most, one or more jurors may have requested evidence already admitted and obviously relevant: the DOC Handbook and the dates Plaintiffs were incarcerated at relevant institutions. The questions did not remotely indicate that any conversation was had which may have related to a point of view about the evidence or the outcome. No party asked the Court to engage in any further inquiry. At no time did Duxbury seek to have the Court interview the jury, nor did he request the Court take any additional action, nor did he object to the action taken. There was no error and Duxbury waived any claim he may have had. Cf. Diaz 597 F.3d at 69.[1]

Regardless, any error is harmless. The Court instructed the jurors to both put any discussion "out of their mind," and to have an "open mind" until deliberations commenced later that morning upon the conclusion of the case.  Notably, all parties assented to the Court's proposed course of action.  The Court remediated any misconduct that might have occurred, and no party, after the curative instruction, offered an objection or suggestion of any other course of action. Further, even with the benefit of hindsight and the opportunity for careful reflection, Duxbury has not asked the Court to conduct a colloquy of the jurors.  In the present

---

[1] The government in Diaz argued that the First Circuit should engage in a plain error review because the defendant did not object to the court's original response or to its instruction the next day. The First Circuit did not address the timeliness of defendant's objection finding that even under the lesser, abuse of discretion review, the court's actions were appropriate. Id. at 62.

circumstances, the Court determines that such a post-trial inquiry is not necessary.  Accordingly, the Motion for New Trial on this ground is DENIED.

B.   Weight of the Evidence

 Duxbury next argues the verdict is against the weight of the evidence. Doc. 129 at 4. This Court is mindful that "[t]he tide runs strongly against a litigant seeking to overturn a jury verdict." Climent-Garcia v. Autoridad de Transporte Maritimo y las Islas Municipio, 754 F.3d 17, 20 (1st Cir. 2014). "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Malone v. Lockheed Martin Corp., 610 F.3d 16, 20 (1st Cir. 2010).  In this case, the relevant evidence amounted to a credibility dispute about what happened, with dueling versions between Plaintiffs and Duxbury. Simply stated, there is no convincing basis for this Court to overturn the jury's verdict.

At trial, the evidence showed that Giorgio wrote a letter to Duxbury on June 12, 2009, asking for permission to engage in Native American ceremonies, including smudging. Doc. 117 at 95. After receiving no response, Giorgio wrote another letter on June 28, 2009, asking to meet with Duxbury. Doc. 117 at 96. Duxbury testified he received many letters and often did not have time to respond. Doc. 119 at 27, 41.

According to Giorgio, he met with Duxbury, during which time Giorgio says Duxbury told him smudging would not occur.  Giorgio described the meeting as follows:

Q. Did you have the meeting you requested with Mr. Duxbury?

A. I did.

Q. Where did that take place?

A:  In his office.

Q. Who else was present?

A. No one.

Q. And what did you say to him, what did he say to you?

A. I asked him when we were going to be able to establish smudging and what the process would be at this facility since it wasn't established before. He told me it was established before and asked me if I was going to be one of the other natives that wanted to smoke a pipe, as opposed to discussing when and how I would be able to smudge. And then he preceded by telling me he thought I would have to prove that I was Native American in order to smudge or to get my supplies.

Q. Did he tell you whether or not he was going to accommodate your request for smudging supplies?

A. He said given the fact that that facility was a pre-release facility, he didn't see it being very probable.

Doc. 117 at 96-97.

Similarly, Traver testified:

Q. After the second letter, which was June 28, 2009, but before you filed the grievance on July 9, 2009, did your brother tell you about a meeting he had with Mr. Duxbury?

 A. Yes.

Q. What did he say?

A. He told us that Mr. Duxbury would not accommodate us at the facility, that Matt was just one of the guys that wanted to smoke the pipe and he thought we would have to prove our Native American heritage and background in order to get anything done.

Doc. 119 at 72.

Duxbury, on the other hand, testified that he did not recall the substance of a conversation

he had with Giorgio.

Q: You never -- you used the word "meeting." Did you have a conversation with Mr. Giorgio about his request for -- to engage in Native American religious services?

A.  I don't recall.

Q. You're not saying you didn't, but you don't recall.

A. I don't recall.

Q. So it might have happened, but you just don't remember it.

A.  Yes

Doc. 119 at 27-28.

After this meeting, Giorgio filed a grievance on July 9, 2009, requesting among other things "smudging materials." Doc. 117 at 97.  The grievance was allowed. [2] Two weeks later, Plaintiffs testified that they had not received the materials.  Traver testified to the following exchange with Duxbury:

Q. Did you wait a period of time before you spoke to anybody else about your materials?

A.  Yeah. Roughly two weeks later, I ran into Mr. Duxbury in the hallway.

Q. What did you say to him, or did he say to you?

A. I asked again if he knew what the status was of when our materials would arrive and he said he had no idea and he said if I liked my pre-release status, I won't keep pushing this issue, because I [Duxbury] can make things very difficult for you.

Q. Did you take that as a threat in your own mind as to your pre-release status?

A. Absolutely.

Doc. 119 at 72-74.

Giorgio testified further that:

---

[2] This is unsurprising as Christopher Mitchell of DOC testified that the DOC authorizes smudging, that the DOC religious handbook (which was based on the Federal Bureau of Prisons handbook), specifically allows smudging and that the DOC handbook was written in 1999-2000, for among other reasons to resolve inconsistencies in how different institutions handled religious practices. Doc. 119 at 119-20.

Q. What did your brother, Colin Traver, say to you that Mr. Duxbury had said?

A. He said he told him not to push the issue, or he'll turn him back to higher custody.

Q. And what else did he say?

A. He said to stop pushing it, that they weren't going to accommodate us, period. That was just the end of story.

Q. Did you take that as a threat to your pre-release status?

A. Absolutely.

Doc. 117 at 101.[3]

Duxbury also testified that he recalled having had a conversation with Traver but that he never threatened Traver nor did he tell Traver he would not give him the smudging items:

Q: Now, do you recall having a conversation with Mr. Traver about smudging materials?

A.  Yes.

Q. And did Mr. Traver ask you when he could get those smudging materials?

A. I don't recall the substance of that conversation.

Q. So you're not saying, again, that he didn't, you're just saying you don't recall now?

A. I don't know when he would have spoken to me, no.

Q. Well, a minute ago, you did say you had a conversation with him, right?

A. I had a conversation with him, yes.

Q. And you had a conversation about the smudging materials, right?

A. Yes.

Q. Okay. So that -- that you do remember.

---

[3] Giorgio's testimony was admitted not for the truth of the matter asserted, but for the effect that Traver's statement had on Giorgio's state of mind. Doc. 117 at 98-100.

A. Yes.

Q. And my next question is, is did he ask you in that conversation when he could get the smudging materials?

A. I don't recall.

Q. You're not saying he didn't ask you, you're just saying you don't remember?

A. I don't remember the substance of that conversation, other than it had to do with smudging.

　　　…

Q. But you do have a memory of speaking with Mr. Traver about the smudging materials in general?

A. In general. I don't know when that took place.

Q. And -- but you don't recall if Mr. Traver asked you for them, correct?

A. Correct.

　　　　　　　　　　　　　…

Q: So you never threatened Mr. Traver and told him I will not give you your smudging materials?

A.  No.[4]

Doc. 119 at 30, 58.

Plainly, the jury believed the testimony of the Plaintiffs and rejected the testimony of

Duxbury. This is the province of the jury. A court "may not make credibility determinations or

weigh the evidence," because "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves

v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citations and internal quotations

omitted).  Moreover, the jury's choice was a reasonable one on the record before the Court. The

---

[4] The Court understood Duxbury to be denying both the threat and the refusal to give Traver the smudging materials.

13

Court found each Plaintiff credible; their testimony was reasonable and consistent with the evidence. For the reason stated, Duxbury's motion on the grounds that the weight of the evidence was against the verdict is DENIED.

    C.  <u>Qualified Immunity</u>

Duxbury argues that he is, as a matter of law, qualifiedly immune from damages under 42 U.S.C. § 1983. Doc. 129 at 6. Plaintiffs argue the defense of qualified immunity was waived because Duxbury never raised the issue during trial and did not request any jury instruction on the issue or object to the instructions given by the Court. Doc. 131 at 10.  However, Duxbury did plead qualified immunity in his answer, Doc. 38, and he asserted the defense in other pretrial submissions, including his Motion for Summary Judgment and his trial brief. Docs. 66 and 97. Thus, the defense was not waived. <u>See</u> <u>Wilson v. City of Boston</u>, 421 F.3d 45, 53 (1st Cir. 2005) (where defendant loses qualified immunity defense on summary judgment, he can re-assert the defense post-trial). Duxbury now seeks to renew his qualified immunity defense, post-trial. A review of a post-trial qualified immunity ruling, requires that "evidence pertaining to factual findings, must be construed in the light most hospitable to the party that prevailed at trial." <u>Davis v. Rennie</u>, 264 F.3d 86, 113 (1st Cir. 2001) (internal citations and quotation marks omitted). Viewed in this light, Duxbury has no qualified immunity defense.

In order to decide whether a public official is entitled to qualified immunity,"[a] court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation. <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009) (internal citations and quotation marks omitted). "To overcome qualified immunity, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right." Id. (internal citation and quotation marks omitted). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (internal citations and quotation marks omitted). Thus, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Id. (internal citation omitted). Plaintiffs' right to practice their religion generally, and by smudging in particular, was clearly established—a point Duxbury has all along conceded. Doc. 66 at 11; see also n. 2 supra.

The only remaining question is whether Duxbury's conduct was unlawful in the situation he confronted. The evidence demonstrated, among other things, that: (1) Duxbury knew Plaintiffs' grievance was allowed; (2) he ordered the smudging materials; (3) the materials arrived at Pondville; (4) Duxbury put them in his office; and, (5) he threatened Plaintiffs' pre-release status if they continued to try to smudge. An official in Duxbury's position would have known his conduct was unlawful in the situation he confronted.

Next, Duxbury argues that placing restrictions on Plaintiffs' access to smudging materials based on concerns for security fall within defendant's discretionary functions and his actions are entitled to qualified immunity. Doc. 129 at 6-7.  Perhaps so, but Duxbury misses the point. The issue at trial was not whether any given restriction relating to smudging fell within a legitimate penological interest, but rather whether Duxbury threatened Plaintiffs in the event the Plaintiffs pressed their requests to smudge. The jury resolved that dispute, based upon sufficient evidence, in favor of Plaintiffs.  Qualified immunity does not shield Duxbury from liability for threatening Plaintiffs for the mere exercise of their clearly established constitutional right, and the factual record on which the qualified immunity analysis rests does not include a finding that reasonable

restrictions, lack of effort by Plaintiffs, or the failure of others prevented the smudging.

Accordingly, Duxbury's motion on the ground of qualified immunity is DENIED.

D. Passion and Prejudice

Duxbury moves for a new trial on the grounds that the jury was influenced by passion and prejudice, which, he argues, caused the jury to award an excessive amount in damages. Doc. 129 at 7. Duxbury offers no evidence of how the jury's passion affected their verdict. Moreover, "[j]urors are not expected to act as automatons, stripped of all feelings. Rather, the passion and prejudice against which the law guards are undue passion and unfair prejudice—passion and prejudice of the sort which cloud impartial scrutiny and reasoned evaluation of the facts…." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 580 (1st Cir. 1989).  Here, Duxbury has "pointed to nothing, other than the amount of the award, that might indicate to us that the verdict was the product of undue passion." Id.  However, the "size of the jury's award does not prove the verdict was the product of undue passion." Id.  Accordingly, there is no basis upon which to conclude that the jury's verdict was the result of undue passion or unfair prejudice. The verdict, on the merits, was based upon a reasonable and fair resolution of the factual dispute and application of the Court's instructions. Duxbury's motion on this ground is DENIED.

E. Conflict of Interest

Duxbury points to a litany of  purported shortcomings in the conduct of his defense by DOC which he contends are a result of a conflict of interest in DOC's representation, such that the verdict is a miscarriage of justice. Doc. 154-1 at 9-14. While Duxbury raises some potentially troubling issues in this respect, including the assertion that he was never apprised of any of Plaintiffs' offers of settlement, the Court will not order a new trial where Duxbury has not "demonstrated that counsel actively represented conflicting interests and that an actual conflict of

interest adversely affected his lawyer's performance." <u>Gordon v. Norman</u>, 788 F.2d 1194, 1197

(6th Cir. 1986) (citing <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1979)). Here, the DOC was not a party

to the action, and there was no actual conflict before or during the trial.  Duxbury has not

demonstrated that he was "adversely affected" by any purported conflict or that [his] trial

counsel failed to exercise independent judgment depriving [him] of a fair trial." <u>Id.</u>  Accordingly,

Duxbury's motion on this ground is DENIED. [5]

## II.    REMITTITUR

Duxbury asks this Court for a new trial, or remittitur and vacating the award of damages

in its entirety. "A district court should only grant such motions if the outcome is against the clear

weight of the evidence such that upholding the verdict will result in a miscarriage of justice."

<u>Monteagudo v. Asociación de Empleados del Estado Libre Asociado</u>, 554 F.3d 164 (1st Cir.

2009) (internal citations and quotation marks omitted). "[A] party seeking remittitur bears a

heavy burden of showing that an award is grossly excessive, inordinate, shocking to the

conscience of the court, or so high that it would be a denial of justice to permit it to stand." Id.

(internal citation and quotation marks omitted). A review of damages requires a court to review

the evidence in the light most favorable to the prevailing party. <u>Eastern Mount. Platform Tennis,</u>

<u>Inc. v. Sherwin Williams Co.</u>, Inc., 40 F.3d 492, 502 (1st Cir. 1994) <u>cert. denied</u>, 515 U.S. 1103

---

[5] Duxbury also requests that the Court overturn the verdict on what amounts to a malpractice-
type theory, contending that "DOC did not advance a full and complete defense." Doc. No. 154-
1 at 10. Assuming without deciding that this type of theory could, as a matter of law, provide a
basis to award a new trial, the present circumstances do not warrant a new trial on this basis.
Two, not one, attorney represented Duxbury at trial. Both participated in the defense of the case.
Evidence and credibility determinations decided this case.  To the extent, Duxbury points to
evidence not offered or (questions not asked on cross-examination), he has not made a sufficient
showing to warrant a new trial. Further, the Court perceives no decisions tainted by the conflict
Duxbury advances.

(1995). Great deference is afforded to a jury's assessment of the appropriate damage award. Toucet v. Maritime Overseas Corp., 991 F.2d 5, 11 (1st Cir. 1993).

Duxbury argues that the award of $50,000 to Traver and $50,001 to Giorgio was grossly excessive because the testimony regarding the impact of not being able to smudge was "limited and vague." Doc. 129 at 9. Duxbury is incorrect. Plaintiffs each testified that their father was Native-American and that from an early age he taught them to smudge, as part of his Native-American religion. Doc. 117 at 86-85; Doc. 119 at 65. They also testified that they engaged in smudging on a regular basis as children and later on in life. Id. By the time the Plaintiffs arrived at Pondville in May 2009, they had been in about seven different prison facilities; first in Connecticut, then in Massachusetts in the course of discharging combined sentences imposed in those jurisdictions of about ten years. Doc. 117 at 87-93. Both Plaintiffs testified that they engaged in smudging at each and every correctional institution over the prior ten years and that they did so on a regular basis, typically three to four times per week, as often as they could. Doc. 117 at 93; Doc. 119 at 71. Duxbury made no significant challenge to this evidence.

In addition, both testified that smudging was part of the practice of their religion, that it was important to them and, especially in prison, it helped them cope and adapt. Specifically, Giorgio testified that the inability to smudge "wreaked havoc" on him, and "[h]aving something that I was able to have for that amount of time through bedlam and hell, to have that moment to be able to be home and pray every day for a few minutes, to stand on mother earth, to cleanse myself of all that negative. It was huge, it was a struggle." Doc.117 at 106.

Traver testified that smudging gave him:

> [T]ime to separate, get away from the chaos inside, to release that pain we felt
> every day, the emotions that-everything. That was such an intricate part of us

> changing and getting better, holding on to ourselves, making ourselves better, holding on to while we were in there. Keeping true to ourselves.

Doc. 119 at 77-78.

The Plaintiffs testimony, credited by the jury, establishes smudging was an important form of regular prayer for each Plaintiff. Denying an individual, especially one incarcerated, a conferred right to pray can have a significant and material negative impact on an individual. Awarding $50,000 (or $50,001) for the months long interference with this right reflects the jury's determination that Plaintiffs should be compensated for the negative effect of not being able to smudge, a decision which is within the province of the jury.  Accordingly, Duxbury's motion is DENIED on this ground.[6]

Next, Duxbury seeks a new trial on the grounds that no expert testimony was presented as to the significance of smudging to a Native American practitioner and that neither Giorgio nor Traver submitted any evidence of symptoms associated with emotional distress or mental anguish or the loss of capacity for the enjoyment of life. [7]  Doc. 129 at 9.  The First Circuit, however, imposes no such requirement.[8]  Although relevant, a "plaintiff does not need to

---

[6]A challenge to an award of damages on Due Process grounds is relevant to a punitive damages award which is not presently before the Court. Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 47 (1st Cir. 2009).

[7]Of course Duxbury himself presented evidence that smudging is a recognized and integral part of Native American religious practice. Doc. 119 at 121.

[8] There is a split in authority as to whether the Prison Litigation Reform Act ("PLRA") bars compensatory damages where no actual physical injury is present. See Shaheed-Muhammad v. DiPaolo, 393 F.Supp.2d 80, 107 (D. Mass. 2005) (collecting cases by circuit).The PLRA, 42 U.S.C. §1997e (e) provides that: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18, United States Code."). The First Circuit has not decided the issue stating, without deciding, that: "it could preclude [plaintiffs] from recovering on [their] §1983 claim seeking compensatory damages." Violette v. Smith, 62 F.3d 8 (1st Cir. 1995). Regardless, while Duxbury pled the PLRA as an affirmative defense, he never raised the issue during the course of the litigation or at trial, or in this motion. Accordingly, this Court does not consider the

present expert testimony to recover damages for emotional distress caused by the violation of

his civil rights." <u>Mendez-Matos v. Municipality of Guaynabo</u>, 557 F. 3d 37, 47 (1st Cir. 2009).

Moreover, "in a civil rights action a plaintiff who proves only an intangible loss of civil rights

or purely mental suffering may . . . be awarded substantial compensatory damages." <u>DiMarco-</u>

<u>Zappa v. Cabanillas</u>, 238 F.3d 25, 37 (1st Cir. 2001) (citing <u>Perez v. Rodriguez Bou</u>, 575 F.2d

21 (1st Cir. 1978)).  The suffering of "gross indignities" as a result of discrimination with one's

religious practices is compensable. <u>Perez</u>, 575 F.2d at 24.  "[T]he esoteric nature of damages for

emotional distress," <u>Tobin</u>, 553 F.3d at 145 (quotations and citations omitted), and a "court's

normal disinclination to second-guess a jury's evaluation of the proper amount of damages [are]

magnified where," as here, "the damages entail a monetary valuation of intangible losses."

<u>Blinzler v. Marriott Int'l, Inc.</u>, 81 F.3d 1148, 1161 (1st Cir. 1996) (citations and quotation marks

omitted).  Given the evidence presented, the jury reasonably could have found: that smudging is

a meaningful religious practice of Native-Americans; that prior to arrival at Pondville Plaintiffs

smudged regularly and repeatedly over the prior ten years (and had done so at some point dating

back to childhood); that smudging was an important religious practice for both of them; that

Duxbury interfered with their ability to smudge in the form of implied threats of punishment;

and, that this interference caused each Plaintiff to suffer both a meaningful and significant

impairment of their practice of  religion and significant emotional distress. Duxbury has failed

to demonstrate the award of compensatory damages is "grossly excessive, inordinate, shocking

---

issue, as the issue has been waived. <u>Cookish v. Cunningham</u>, 787 F.2d 1, 6 (1st Cir. 1986) (per
curiam) (citing <u>Bratt v. International Business Machines Corp.</u>, 785 F.2d 352, 362 n.1 (1st Cir.
1986) (breach of confidentiality claim mentioned in complaint but never pressed deemed
waived); <u>Wallace Motor Sales</u>, 780 F.2d 1049, 1067 (1st Cir. 1985) (issue raised in pleadings but
not at trial was not "presented" to district court and could not be argued on appeal).

to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Tuli, 656 F.3d at 44.

One final point as to compensatory damages bears mention. Duxbury asserts inconsistency in the virtually identical awards to the two Plaintiffs, noting that Giorgio spent eighty-six more days at Pondville than Traver, which according to Duxbury demonstrates that the jury did not carefully parse through the evidence to account for the significant difference in time that each Plaintiff was unable to smudge at Pondville. Doc. 129 at 10. Duxbury's assertion assumes that the jury calculated compensatory damages based on the number of days each Plaintiff spent at Pondville. While this is a possibility, there is nothing in the record to which Duxbury can point which establishes conclusively that this was the jury's approach. Indeed, "translating legal damage into money damages--especially in cases which involve few significant items of measurable economic loss--is a matter peculiarly within a jury's ken." Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 32 (1st Cir. 2012) (internal citations and quotation marks omitted).  The jury could well have decided the suffering each Plaintiff endured was essentially equal. Accordingly, Duxbury's motion as to compensatory damages is DENIED.

<u>CONCLUSION</u>

For the foregoing reasons, Steven Duxbury's Motions For A New Trial Or In The Alternative, Remittitur and Vacating the Damage Award, Docs. 128 and 154, are DENIED. In the course of ruling on this motion, the Court has considered the arguments advanced in Duxbury's Motion, Doc. 154, for reconsideration regarding summary judgment. Insofar as Duxbury requests reconsideration of the Court's ruling on summary judgment, separate and apart from the relief discussed above, the Motion is DENIED.  See Ortiz v. Johnson, 562 U.S. 180,

184 (2011) ("[O]nce trial has been had, however, the availability of official immunity should be determined by the trial record, not the pleading nor the summary judgment record.") (internal citation and quotation marks omitted).

Plaintiffs' Motion for Attorney Fees Renewed, Doc.126, and Supplemental Motion for Attorney Fees, Doc. 135, are administratively terminated.  Plaintiffs may file one renewed motion for attorney fees, within fourteen days, encompassing all fees it seeks in this case which, if necessary, the Court will relate back to the date of filing of Doc. 126.  Plaintiffs shall advise the Court within seven days whether they are pressing their motion for post-verdict discovery, Doc. 132, at this time.  If so, Defendant shall respond seven days thereafter..

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge